**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**PATRICK GUILLORY**,

                                        Plaintiff,

        - v -                                                        Civ. No. 9:12-CV-00280
                                                                            (LEK/RFT)

 **BRIAN FISCHER**, *Commissioner, DOCCS*, **CATHERINE**
**JACOBSEN**, *Acting Commissioner of Programs, DOCCS*,
**KAREN McDANIEL**, *Acting Deputy Superintendent of*
*Programs, Mid State Correctional Facility*, **KURT ELLIS**,
*Cleric, Mid State Correctional Facility*, **NICK DEMMA**,
*Acting Food Services Administrator, Mid State Correctional*
*Facility*, **THEDA KUPIEC**, *Senior Mail Room Supervisor,*
*Mid State Correctional Facility,* **ROBERT WEBER**, *Cleric,*
*Mid State Correctional Facility*, **DANIEL CRAWFORD**,
*Deputy Superintendent of Security, Gouveneur Correctional*
*Facility*, **NUNZIO DOLDO**, *Acting Superintendent, Gouveneur*
*Correctional Facility*,  **ROBERT PIRIE**, *Deputy Superintendent*
 *of Programs, Gouveneur Correctional Facility*,

                                        Defendants.

**APPEARANCES:**                                        **OF COUNSEL:**

**PATRICK GUILLORY**
Plaintiff, *Pro Se*
09-B-0714
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

**HON. ERIC T. SCHNEIDERMAN**                    **ROGER W. KINSEY, ESQ.**
Attorney General of the State of New York          Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

Plaintiff Patrick Guillory, a New York State prison inmate proceeding *pro se* and *in forma pauperis*, commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[1] the First and Fourteenth Amendments, by: (1) substantially burdening his ability to practice his chosen religion – Judaism; (2) retaliating against him for filing grievances and lawsuits against various Defendants; (3) interfering with the free flow of his mail; and (4) giving preferential treatment to inmate groups from other faiths.[2] *See* Dkt. No. 1, Compl. Defendants now move for dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 30. Plaintiff opposes the Motion. Dkt. Nos. 32, Pl.'s Opp'n, & 34, Pl.'s Suppl. Opp'n. For the reasons that follow, it is recommended that Defendants' Motion be **GRANTED in part and DENIED in part.** Moreover, in light of Plaintiff's *pro se* status, it is further recommended that Plaintiff be **GRANTED LEAVE TO AMEND** his pleading in certain respects.

## I. BACKGROUND

The following facts, summarized from the Plaintiff's Complaint, must be considered as true on a motion to dismiss. *See infra* Part II.A. At all times relevant to the Complaint, Plaintiff was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Compl. at ¶ 3. Plaintiff is an active observant of Judaism. *See generally id.*

---

[1] RLUIPA is codified at 24 U.S.C. § 2000cc, *et seq.*

[2] Plaintiff filed another lawsuit in the Northern District, prior to the instant suit, on May 31, 2011. *Guillory v. Ellis et al.*, Civ. No. 9:11-CV-600 (ATB/MAD). That suit alleges various civil rights violations, including claims for retaliation, religious discrimination, and interference with the free flow of mail. *See id.* In addition to the similarities between those claims and the claims in the instant case, both lawsuits share in common Defendants Ellis, Kupiec, and Fischer. *See id.*, Compl.

Plaintiff's current claims arise from incidences that occurred while Plaintiff was imprisoned at Mid-State Correctional Facility ("MSCF") and Gouverneur Correctional Facility ("GCF"). *See id*. at ¶ 52.

## A.  Mid State Correctional Facility

Plaintiff was an inmate at MSCF until August 3, 2011. Compl. at ¶ 52. On May 31, 2011, while housed at MSCF, Plaintiff filed a civil rights action ("May 2011 § 1983 Action") with this Court against various DOCCS officials, some of whom are likewise named in the current Complaint. *See supra* note 2. Three separate incidences relevant to Plaintiff's claims herein occurred while he was imprisoned at MSCF.

### 1.  July 11 Services

On July 11, 2011, Plaintiff and other Jewish inmates were prevented from attending Jewish services in the small chapel. Compl. at ¶ 19. On that same day, Defendant Ellis, Cleric at MSCF, held religious services for the Christians in the large chapel, and Defendant Weber, Cleric at MSCF, approved services for observants of the Wiccan faith. *Id*.

On July 12, 2011, Plaintiff wrote a letter[3] to Defendant McDaniel, the Acting Deputy Superintendent of Programs, complaining that his name was not on the call-out list for Jewish services on July 11. *Id.* at ¶¶ 24 & 33. Defendant McDaniel responded on the same day, apologizing for the fact that his name was not on the call-out list, and stating that she was "examining procedures and taking measures to ensure that this type of error does not occur in the future." *Id.*

---

[3] It appears that a grievance was also submitted to the Inmate Grievance Review Committee on July 11, 2011, regarding this same incident. Compl. at ¶ 41. That grievance was granted on July 28, 2011. *Id.*

## 2. Fast of Tammuz

On July 14, 2011, Defendant Jacobsen, DOCCS' Acting Commissioner of Programs, sent a memorandum to Defendant Demma, MSCF's Food Service Administrator, Defendant Weber, MSCF's Coordinating Chaplain, and Defendant McDaniel, "ordering" them to provide food for Plaintiff before and after the Fast of Tammuz, on July 19, 2011. *Id.* at ¶ 35. In this memo, Defendant Jacobsen "addresses" the grievance Plaintiff filed on July 12. *See* Pl.'s Opp'n at pp. 8–10.[4] Notwithstanding Jacobsen's order, Plaintiff was not provided with any food prior to nor after fasting on July 19. Compl. at ¶ 36. Nonetheless, Plaintiff fasted all day in observance of the Fast of Tammuz. *Id.*

On July 28, Defendant McDaniel sent Plaintiff a memorandum indicating that she was aware he had observed the Fast of Tammuz and was supposed to receive food to break his fast. *Id.* at ¶ 40. On September 9, in response to a letter written by Plaintiff, Defendant Jacobsen sent Plaintiff a memorandum acknowledging her awareness of the July 11 and July 19 incidents. *Id.* at ¶ 61 & Ex. M. On November 14, in response to letters written by Plaintiff, Defendant Jacobsen, this time acting at the request of Defendant Commissioner Fischer, sent Plaintiff a similar memorandum. *Id.* at ¶ 101 & Ex. W.

## 3. Mail Tampering

On July 29, 2011, while outside of Plaintiff's presence, Defendant Kupiec, the Senior Mail Room Supervisor at MSCF, who is also named as a defendant in Plaintiff's May 2011 § 1983 action, opened and read mail addressed to Plaintiff from the Postmaster of Marcy, New York, and then

---

[4] For the purposes of evaluating a motion to dismiss brought against a *pro se* plaintiff, the Second Circuit has deemed facts found in a plaintiff's response to a defendant's motion to dismiss to be part of the plaintiff's complaint – even though they were not contained within the original complaint. *See Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 (2d Cir. 1998) (*per curiam*).

destroyed the original envelope.  Compl. at ¶ 43.

### B.  Gouverneur Correctional Facility

On August 3, 2011 Plaintiff was transferred from MSCF to GCF.  *Id.* at ¶ 52.  Four separate incidences relevant to Plaintiff's claims occurred while he was imprisoned at GCF.

### 1.  Festival of Sukkot

The Jewish Community at GCF observed Sukkot from sundown on Wednesday, October 12, to sundown on Friday, October 21.  Compl., Ex. T.  In accordance with Jewish custom, Rabbi Snyder[5] arranged for a Sukkah Booth[6] to be erected outside of the Activities Building at GCF where observants would be able to pray over and eat their holy meals under the stars during the Festival. *Id.*  Inmates wishing to use the Sukkah Booth were instructed to enter the Activities building through the main entrance, sign in with the Activities Building Officer, and wait their turn.  *Id.*  Additional arrangements were made by Rabbi Snyder for inmates observing the holiday to receive hot kosher meals on two evenings at the beginning of the Festival,[7] all other meals served during the Festival were to consist of the cold alternative diet.  *Id.*  On August 24, Plaintiff filled out and returned a memorandum sent to him by Rabbi Snyder, asserting that he would be eating his holy meals in the Sukkah Booth during the Holy Week of Sukkot.  Compl. at ¶ 59 & Ex. K.

---

[5] Rabbi Snyder is not a Defendant in this action.

[6] A Sukkah booth is structure with a roof made from "natural plant materials (e.g., pine branches, corn stalks, bamboo) placed densely enough to feel like a roof but one may still see the stars through them. . . . A chair [is] placed in the sukkah for the inmates to use while they eat."  Compl., Ex. T.

[7] Participants were responsible for heating up their own meals in the microwave, even those observants who had lost microwave privileges were supposed to be permitted to use the microwave to heat up their holy meals.  Dkt. No. 1-1,  Ex. T.

On October 12, GFC's Food Service Administrator, P. Bruyere,[8] issued the Plaintiff a frozen dinner. Compl. at ¶ 66. Plaintiff was unable to heat the meal up in the microwave because Defendants Crawford, Deputy Superintendent of Security at GCF, Doldo, Acting Superintendent at GFC, and Pirire, Deputy Superintendent of Programs at GCF, had ordered that the microwave be removed from Plaintiff's housing unit between October 12 and 15. *Id.* at ¶¶ 68–70, 95, & 98. On October 13, Plaintiff received a memorandum from Defendant Pirie stating that since Plaintiff had already spoken with Bruyere, and "steps h[ad] been taken to resolve t[he] matter," no further action was necessary. *Id.* at ¶ 76 & Ex. N. Nonetheless, on October 13, Plaintiff was once again unable to heat up his frozen holy meal. *Id.* at ¶ 75(2). Moreover, on October 13, Defendant Crawford, ordered all of the Correction Officers (hereinafter "CO") not to open the Activities Building where the Sukkah Booth was located, thereby preventing Plaintiff from praying over and eating his holy meals in the Sukkah Booth. *Id.* at ¶¶ 72–75(1). On October 14, Plaintiff filed a grievance asserting religious discrimination, retaliation, unequal protection, and "Jew [h]ating actions," and sent copies of the grievance to Defendants Jacobsen, Pirie, and Fischer. *Id.* at ¶ 78.

Plaintiff was similarly prevented from accessing the Activities Building for breakfast and lunch on October 14 and 15, and for all of his meals on October 16. *Id.* at ¶¶ 77, 80, & 81. Yet, Defendants Doldo, Crawford, and Pirie opened the Activities Building at noon on October 14 to allow Muslims to hold services in observance of Jumah, as well as at 10:00 a.m. on October 15 to allow the Catholics to enjoy their services, and again on October 16 at 9:30 a.m. to allow the Protestants to enjoy their services. *Id.*

On October 17, Plaintiff received a letter from Defendant Pirie in response to a letter Plaintiff

---

[8] P. Bruyere is not a Defendant in this action.

had sent to Defendants Crawford and Pirie.[9]  The letter stated that a meeting had been held that day to ensure that a CO would be available to facilitate the use of the Sukkah Booth by inmates who were interested in doing so.  *Id.* at ¶ 84 & Ex. O.  Yet, on October 19, Plaintiff was unable to use the Sukkah Booth because there were no COs on duty to open the Activities Building. *Id*. at ¶ 85.  By this point Plaintiff had not eaten for a total of 104 non-consecutive hours over the course of the Festival.[10]  *Id.* at ¶¶ 85 & 91.

At some point, Plaintiff filed an inmate grievance with the Inmate Grievance Resolution Committee ("IGRC") complaining of the 104 hours he was denied food during the Festival of Sukkot.[11]  On November 15, Defendant Doldo affirmed the IGRC's resolution of his grievance and Plaintiff appealed.  *Id.* at ¶ 102 & Ex. X.  On December 2, Plaintiff sent Defendants Fischer and Jacobsen a letter, stating that he was being retaliated against and subjected to anti-semitic discrimination. *Id*. at ¶ 103.  Defendant Jacobsen replied on December 13, relaying to Plaintiff, *inter alia,* that his complaints were already being addressed in his appeal of the IGRC's decision,  and he should be patient while the appellate process continued to unfold.  *Id.* at ¶ 104 & Ex. Z.

### 2.  Destruction of Mail

On August 22, 2011, Defendant Kupiec, the Mail Room Supervisor at MSCF, ripped up a letter addressed to Plaintiff containing his test scores from a paralegal training course he had taken, then mailed the pieces to him at GFC.  Compl. at ¶ 56.

---

[9] It is unclear when Plaintiff sent the letter to which Defendant Pirie responded to.

[10] It appears that Plaintiff was able to eat some of his meals, however he was unable to eat for 12 hours on October 12, 24 hours on October 13, 18 hours on October 14 & 15, 24 hours on October 16, and 8 hours on October 19. Compl. at ¶ 91.

[11] It is unclear when this particular grievance was filed, however, it is quite likely that Plaintiff is referring to his October 14 grievance as it was the last one mentioned in his Complaint.

### 3. Chanukah

On December 26, 2011, during the eight-day celebration of Chanukah, ultra-orthodox Rabbis were not permitted to bring any sealed religious foods into the prison for the Jewish inmates because of security concerns. *Id.* at ¶ 105. However, on other occasions Defendants Jacobsen, Pirie, Fischer, Doldo, and Crawford allowed Christians and Muslims to bring unsealed food into the facility for their religious celebrations. *Id.*

### 4. Inmate Facilitators

Muslim inmates were allowed to have inmate facilitators to perform services when the Imam was unavailable, but Jewish inmates did not have the same privilege. *Id.* at ¶ 107.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). Moreover, "even if not attached

or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 697 (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is

not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims . . . across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

## B. ANALYSIS

### 1. Eleventh Amendment

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.'" *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 447-48 (2d Cir. 1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. at 98-101; *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993); *Daisernia v. State of New York*, 582 F. Supp. 792, 796 (N.D.N.Y. 1984). To the extent a state official is sued for damages in his or her official capacity,

*-10-*

"such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.* 915 F. Supp. 525, 539 (N.D.N.Y. 1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993)); *see also Mathie v. Fries*, 121 F.3d 808, 818 (2d Cir. 1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer [.] . . .").

However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young*, 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.*, 915 F. Supp. at 540.

Therefore, insofar as Plaintiff seeks monetary damages against any Defendant in their official capacity, we recommend that such claims be **DISMISSED**.

### 2. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff

must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

Plaintiff has alleged that Defendant Fischer was personally involved in some or all of the alleged civil rights violations. Compl. at ¶ 126. The entirety of Defendant Fischer's involvement consists of asking Defendant Jacobsen to respond to Plaintiff's letters. Compl. at ¶¶ 101 & 103 & Ex. W. This does not equate to personal involvement. *See Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. Sept. 18, 2009) ("The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter.") (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)). Therefore, we recommend that Defendant Fischer be **DISMISSED.**

For the sake of clarity, issues regarding the personal involvement, or lack thereof, regarding

the remaining Defendants will be conducted within the analysis of the underlying claims.

### 3. Claims Against Defendant Kupiec

Plaintiff has asserted two claims against Defendant Kupiec, one for interference with the free flow of his legal mail and one for retaliation. Compl. at ¶ 124. Both claims arise out of, and are supported by, the same two events: (1) on July 29, 2011, while outside of Plaintiff's presence, Defendant Kupiec opened and read Plaintiff's legal mail and then destroyed the original envelope; and (2) on August 22, 2011, Defendant Kupiec ripped up the Plaintiff's test scores and mailed him the pieces. *Id.* at ¶¶ 43, 56, & 124. However, Defendants contend that Plaintiff already has a separate lawsuit pending in the Northern District of New York in which he asserts these same claims against Defendant Kupiec. *See Guillory v. Ellis*, Civ. No. 9:11-CV-630, Dkt. No. 54, Rep. and Recommendation, dated Mar. 22, 2012, at pp. 3, 14, & 15; *see also Guillory v. Ellis*, 2012 WL 2754859, at *8 & 9 (N.D.N.Y. July 9, 2012).[12]

It is well established in the Second Circuit that, "[a]s part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000)) (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976)). Court's have the power to dismiss such duplicative lawsuits in order to "foster judicial economy . . . [and] protect parties from the vexation of concurrent litigation over the same subject matter." *Id.* (internal quotation marks and citations omitted). Underlying this policy is the principle that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Id.* at 138-39 (citations omitted). Courts have similarly applied this doctrine to a single duplicative

---

[12] *See also Guillory v. Ellis*, Civ. No. 9:11-CV-630, Dkt. No. 48-1, Pl.'s 7.1 Statement/Mem. of Law, at ¶¶ 51, 56, 96, 98, & 100.

claim lodged within a lawsuit containing additional non-duplicative claims as well. *See Taylor v. Rodriguez*, 238 F.3d 188, 197 (2d Cir. 2001) (finding district court did not abuse its discretion by dismissing one claim within plaintiff's complaint as duplicative); *Hofelich v. Ercole*, 2010 WL 102758, at *6–7 (S.D.N.Y. Jan. 11, 2010) (dismissing a single claim against one defendant as duplicative). Nevertheless, "[a] court must be careful, when dismissing a second suit between the same parties as duplicative, not to be swayed by a rough resemblance between the two suits without assuring itself that beyond the resemblance already noted, the claims asserted in both suits are also the same." *Curtis v. Citibank, N.A.*, 226 F.3d at 136.

As noted previously, Guillory initiated an action in this Court on May 31, 2011, against various officials at MSCF and DOCCS. *Guillory v. Ellis*, Civ. No. 9:11-CV-600 (MAD/ATB), Dkt. No. 1, Compl. Three of those individuals are also included in a second lawsuit, which is the action currently under review by the undersigned, namely, Defendants Ellis, Kupiec, and Fischer. In performing an initial screening of the complaint filed in the prior action, the Honorable Mae A. D'Agostino, United States District Judge, dismissed several claims while allowing others to proceed, including a claim against Ellis for interfering with his attendance at a religious service in March 2011 in violation of the First Amendment and RLUIPA, and retaliation and denial of access to courts claims against Kupiec for destroying/losing his mail in January 2011. *Id*. at Dkt. No. 19, Dec. & Order, dated Sept. 27, 2011, at pp. 35–36. Thereafter, Guillory filed multiple requests for relief in that action, including several motions for temporary restraining orders ("TRO") and even a motion for summary judgment ("MSJ"). *See id*. at Dkt. Nos. 4, Mot. for TRO, filed June 8, 2011; 8, 2d Mot. for TRO, filed July 26, 2011; 35, 3d Mot. for TRO, filed Nov. 4, 2011; 48, Pl.'s MSJ, filed Dec. 29, 2011. Guillory's third motion for a TRO, filed on November 4, 2011, included many of the events

he eventually interposed in this second action, *i.e.*, his complaints regarding being denied access to religious services and being denied meals for 104 hours in October 2011. *Id*. at Dkt. No. 35. And, in his MSJ, Guillory included a time-line of events, with accompanying exhibits, that went well beyond the date when he filed his first civil rights complaint and, in doing so, included events complained of in this later action, such as Ellis's role in denying him access to services in July 2011 and Kupiec's destruction of his test scores in August 2011. *See generally id*. at Dkt. No. 48-1.[13]

On March 22, 2012, the Honorable Andrew T. Baxter, United States Magistrate Judge, issued a report-recommendation regarding Guillory's third motion for a TRO and his MSJ. *Id*. at Dkt. No. 54. After reciting the procedural history of the case, Judge Baxter addressed Guillory's request for a TRO. First, Judge Baxter reiterated Judge D'Agostino's prior pronouncement that Guillory's request for injunctive relief with regard to activities that occurred at MSCF were moot in light of his transfer from the facility. *Id*. at pp. 4-5. Second, Judge Baxter observed that Guillory's third TRO was not directed at any defendant included in that action and noted that the events complained of had already taken place and his fear of future retaliation was "too speculative to warrant injunctive relief." *Id*. at pp. 5-6. And, because the TRO dealt with individuals who were not parties to that lawsuit, Judge Baxter advised Guillory that "[i]f additional individuals denied plaintiff his constitutional right to practice his religion, he may move to supplement his complaint <u>or</u> bring a separate action against individuals at Gouverneur."[14] *Id*. at pp. 6-7 (emphasis added).

It would seem that in assessing Guillory's MSJ, Judge Baxter intended to only focus on those claims raised in Guillory's original pleading. Yet, when he assessed whether Guillory was entitled

---

[13] Guillory also included as facts events that transpired at GCF.

[14] Guillory had already filed his second civil rights action prior to Judge Baxter's issuance of his report-recommendation. *Guillory v. Weber*, Civ. No. 9:12-CV-280 (LEK/RFT), Dkt. No. 1, Compl., filed Feb. 15, 2012.

to summary judgment on his retaliation and mail tampering claims against Kupiec, Judge Baxter included an assessment of the claim that Kupiec ripped up Guillory's test scores in August 2011, that is Judge Baxter recommended denial of summary judgment because an issue of fact remained regarding Kupiec's intention in tearing up the document. *Id*. at p. 15. On July 9, 2012, Judge D'Agostino adopted Judge Baxter's recommendations in its entirety. *Id*. at Dkt. No. 78.

Because the destruction of Guillory's test scores by Kupiec occurred after the filing of his prior complaint, and because he never amended that pleading, it is unclear to this Court whether the destruction of Guillory's test scores is truly a part of the earlier action, the summary judgment analysis notwithstanding. Indeed, in reviewing a recent dispositive motion filed by the defendants in the prior action, there is no mention of dismissal of a claim against Kupiec for ripping up test scores. Instead, the motion focuses only on those events included in the original complaint, and because the motion is still pending, it is not clear what, if anything, will survive. *See id.* at Dkt. No. 123. If indeed this claim is not deemed a part of the prior action, it would be an injustice to disallow Guillory to proceed with this claim in this action. Thus, because it is unclear, the Court finds it prudent to not recommend dismissal of this claim at this time. *Curtis v. Citibank, N.A.*, 226 F.3d at 136. This ruling, however, is subject to further review should it become apparent that the destruction of Guillory's test scores is indeed included in the prior action.

### 4. Retaliation

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988). Claims of retaliation, like those asserted by

Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381-83 (2d Cir. 2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d at 492); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their

motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id*. at 492 (internal quotation marks and citations omitted) (cited in *Davis*, 320 F.3d at 353).

In the instant suit, Plaintiff complains of several separate incidences of retaliation which occurred at GCF and MSCF. At the outset we note two important points germane to all of Plaintiff's retaliation claims. First, all of Plaintiff's retaliation claims involve adverse actions spurned by Plaintiff's choice to file a lawsuit and/or grievances. Thus he has clearly established that he was engaged in a protected exercise. *See Jones v. Coughlin,* 45 F.3d at 679-80. Second, each claim alleges acts of retaliation that interfered with Plaintiff's ability to practice his religion. We find that a prisoner of ordinary firmness, forced to choose between exercising the right to file a law suit or grievance, and properly observing the tenants and requirements of their religion, would likely be

deterred from exercising that protected right. *See Davis v. Goord*, 320 F.3d at 353. With these two common threads clearly established, we continue our inquiry.

### a. July 11 Services

Construed liberally, we find that Plaintiff's Complaint alleges that in retaliation for a lawsuit he filed against Defendant Ellis on May 31, 2011, Defendant Ellis prevented him from attending Jewish services on July 11, 2011, by not putting his name on the "call-out" list for services. Compl. at ¶¶ 19 & 31. Defendants contend that this claim should be dismissed because Plaintiff has failed to establish a causal connection between the protected exercise and the aforementioned adverse action. Dkt. No. 30-1, Defs.' Mem. of Law at pp. 9–10. We disagree. The fact that Plaintiff named Defendant Ellis in a lawsuit forty-one days earlier gives rise to a plausible inference that the adverse action, in this case preventing Plaintiff from attending congregate religious services, was indeed motivated by Plaintiff's decision to exercise his protected First Amendment right to file said lawsuit. *See Bennett v. Goord*, 343 F.3d at 139. Therefore, we recommend that the Defendants' Motion to Dismiss Plaintiff's retaliation claim against Defendant Ellis be **DENIED**.

### b. The Fast of Tammuz

Plaintiff claims that in retaliation for a grievance he filed on July 12, regarding his inability to attend Jewish services on July 11, Defendants McDaniel, Weber, and Demma failed to provide him with food to in order to break his observance of the Fast of Tammuz on July 19, 2011, despite the fact that they were ordered to do so. Compl. at ¶ 36. Defendants assert that this claim should be dismissed because Plaintiff failed to allege that Defendants McDaniel, Weber, or Demma knew about the July 12th grievance, and thus failed to plead that a causal connection existed between the alleged adverse action, here withholding food required by Plaintiff for participation in a religious

ceremony, and his protected right to file grievances. Defs.' Mem. of Law at p. 10. Again, we disagree.

Here, Plaintiff alleged that Defendants McDaniel, Webber, and Demma were aware of the July 12th grievance prior to July 19, *via* a memorandum Defendant Jacobsen sent them on July 14, which specifically referenced the July 12th grievance. *See* Pl.'s Opp'n at pp. 8–10. Moreover, such a close temporal proximity – here only days transpired between the time Defendants learned of the grievance and failed to feed Plaintiff – supports a plausible inference that a causal nexus exists between the two incidents. *Dawes v. Walker*, 239 F.3d at 493. Therefore, we recommend that Defendants' Motion to Dismiss Plaintiff's retaliation claim against Defendants McDaniel, Webber, and Demma, for failing to feed him on July 19, be **DENIED**.

### c. Festival of Sukkot

Plaintiff next alleges that in retaliation for a grievance he filed a month earlier against Defendant Kupiec, and/ or because a favorable decision was issued in his other lawsuit, Defendants Crawford, Jacobsen, Doldo, and Pirie prevented him from accessing the Sukkah Booth in the Activities Building making it impossible for him to pray over or eat twelve of his holy meals during the Festival of Sukkot. *See* Compl. at ¶ 125; and *Guillory v. Ellis*, Civ. No. 9:11-CV-600, at Dkt. No. 19, Dec. and Order, dated Sep. 27, 2011 (performing an initial screening of Guillory's civil rights complaint and allowing several causes of action to proceed). Defendants counter that these claims are implausible on their face because the alleged retaliatory acts complained of occurred before Plaintiff exercised his protected right to file a grievance.[15] Defs.' Mem. of Law at p. 11.

---

[15] It would appear that Defendants misunderstood Plaintiff's argument as to what protected exercise Plaintiff alleged to have spawned the adverse actions in this instance. Defendant seems to have read the Complaint to infer that Plaintiff was claiming that the alleged civil rights abuses which occurred during the week long Festival of Sukkot were
(continued...)

It is clear that neither the grievance filed against Defendant Kupiec nor the decision rendered in his other lawsuit are causally connected to the alleged retaliatory acts that occurred during the Festival of Sukkot. Plaintiff has failed to allege that Defendants Crawford, Jacobsen, Doldo, or Pirie had any knowledge of the grievance he filed against Defendant Kupiec, or of the decision issued in his other lawsuit. Moreover, Defendants Crawford, Jacobsen, Doldo, and Pirie were not named in his other lawsuit, none of the named defendants in that action had been served with notice of the action at that point, nor is there any indication anywhere in the Plaintiff's pleading that these Defendants were somehow implicated in the grievance against Defendant Kupiec. Thus, it is implausible that any sort of causal connection existed between the retaliatory acts complained of and Plaintiff's choice to file a grievance or lawsuit.

With regard to Plaintiff's argument that the civil rights abuses which occurred during the Festival of Sukkot were retaliation for a grievance that he filed on October 14, we first note that Plaintiff alleged that he sent a copy of the October 14 grievance to Defendants Pirie, Fischer, and Jacobsen, but not Doldo. Pl's Opp'n at pp. 12–13. Yet, given that the adverse actions complained of began on October 12, it is, as Defendants have argued, implausible that a grievance filed two-days later could have provided "substantial motivation" for the subsequent adverse actions. *See Dawes v. Walker*, 239 F.3d at 492

Therefore, because Plaintiff failed to plead the existence of a plausible causal nexus between

---

[15](...continued)
done in retaliation for a grievance that he filed on October 14 – two days after the Festival and the adverse actions began – rather than for the grievance filed against Defendant Kupiec and the purportedly favorable decision rendered in his other lawsuit. *See* Def.'s Mem. of Law at p. 11; Compl. at ¶ 125. Nonetheless, in his Response Plaintiff rebutted Defendants' argument that the retaliation was spawned by the October 14 grievance. Therefore, out of an abundance of caution, we analyzed whether a plausible causal nexus exists between any of the three alleged protected exercises and the alleged adverse actions.

any protected exercise and any adverse action, we recommend that Defendants' Motion to Dismiss Plaintiff's retaliation claim against Defendants Crawford, Jacobsen, Doldo, and Pirie be **GRANTED**. However, the Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se*] complaint gives any indication that a valid claim might be stated."). Therefore, in light of the Second Circuit's directive and our recommendation that certain of Plaintiff's claims ought to proceed, we further recommend that Plaintiff be **GRANTED LEAVE TO AMEND** his Complaint in order to further specify, how, if at all, any of the adverse actions were causally connected to any protected exercise.

### 5. Free Exercise

Prisoners still maintain some measure of constitutional protection afforded by the Free Exercise Clause of the First Amendment. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Among those protected rights is the right to participate in congregate religious services. *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). These rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system," such as maintaining prison security and discipline. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990); *see also Pell v. Procunier*, 417 U.S. 817, 822 (1974). Free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith*, 850 F.2d 917,

925 (2d Cir. 1988) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)); *see also Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison official furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d at 926 (citations omitted). At the outset, to state a free exercise claim an "inmate need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious."[16] *Ochoa v. Connell*, 2007 WL 3049889, at *6 (N.D.N.Y. Oct. 18, 2007) (citing *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (internal quotations omitted). This requirement helps to "determine an adherent's good faith in the expression of his religious belief[s]" and allows courts to differentiate "between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Id.* (quoting *Patrick v. LeFerve,* 745 F.2d 153, 157 (2d Cir. 1984) & *Ford v. McGinnis*, 352 F.3d at 588).

### 6. RLUIPA

Similarly, RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion."[17] *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).

---

[16] It is unclear in the Second Circuit whether in order to make out a free exercise claim an inmate must at the threshold establish that the alleged infringement "substantially burdened" his ability to practice his religion. *See Ochoa v. Connell*, 2007 WL 3049889, at *6 & n.10 (N.D.N.Y. Oct. 18, 2007) (describing the lack of clarity surrounding this issue in the Second Circuit in the wake of *Ford v. McGinnis,* 352 F.3d 582 (2d Cir. 2003) and *Sherbert v. Verner,* 374 U.S. 398 (1963)).

[17] RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration (RFRA) Act of 1993 in *City of Boerne v. Flores*, 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power
(continued...)

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA does not define "substantial burden," however the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence . . . Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (cited in *Village of Mamaroneck*).

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). Thus, unlike an ordinary free exercise claim brought under the First Amendment, under RLUIPA a plaintiff can establish a violation by proving that the acts of prison officials constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means*.

---

[17](...continued)
under section five of the Fourteenth Amendment ("The Congress shall have power to enforce this article by appropriate legislation"). RLUIPA "corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord*, 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987)

Plaintiff has alleged free exercise and RLUIPA claims against Defendants at both MSCF and GCF. We discuss each in turn.

### a. Events at MSCF

### i. July 11 Services

Plaintiff claims that Defendants Weber, Ellis, and McDaniel prevented him from attending religious services on July 11, 2011. Compl. at ¶ 123.

We are satisfied at this stage that Plaintiff's desire to attend Jewish services on July 11 was a sincerely held belief that was religious in his scheme of beliefs. Plaintiff clearly identifies as Jewish, he has participated in numerous Jewish events and services, including fasting and maintaining a kosher diet. *See e.g.* Compl. at ¶¶ 62–65. Without commenting on the strength of Plaintiff's claim, we are satisfied that he has established a sincerely held religious belief. *See Ochoa v. Connell*, 2007 WL 3049889, at *7 (stating that "participation in other religious activities such as Sabbath observances, dietary strictures, religious meetings, holy feast days, or other significant religious activities" is evidence that an adherents beliefs are religious and sincerely held). Therefore we recommend that Defendants' Motion to Dismiss Plaintiff's July 11 free exercise claim be **DENIED**.

Contrariwise, for purposes of RLUIPA it has been clearly established that a single infringement of a plaintiff's right to attend a religious service is not a substantial burden. *See Gill*

*v. Defrank*, 2000 WL 897152, at *2 (S.D.N.Y. July 6, 2000) ("We agree, moreover, with the recent holdings of those other courts in the Second Circuit, that missing one religious service does not constitute a substantial burden.") (citation omitted); *see also Linares v. Mahunik*, 2006 WL 2595200, at *6–7 (N.D.N.Y. Sept. 11, 2006). Indeed, it is doubtful if even two acts of infringement would be sufficient to surmount the substantial burden threshold. *See Williams v. Weaver*, 2006 WL 2794417, at *5 (N.D.N.Y. Sept. 26, 2006) (allegations that plaintiff missed two ordinary weekly religious services insufficient to state a substantial burden); *Smith v. Graziano*, 2010 WL 1330019, at *10 (N.D.N.Y. Mar. 16, 2010) (collecting cases). Therefore, we recommend that Defendants' Motion to Dismiss be **GRANTED** as to Plaintiff's July 11 RLUIPA claim.

<u>ii.  Fast of Tammuz</u>

Plaintiff further alleges that Defendants Webber, McDaniel, and Demma failed to provide the Plaintiff with food before and after he participated in the Fast of Tammuz on July 19, 2011, in contravention of the First Amendment and RLUIPA. Compl. at ¶¶ 36 & 123. And, that Defendant Jacobsen, as supervisor, permitted this to happen. *Id.* at ¶ 37. Defendants move to dismiss this claim on the grounds that: (1) missing two Kosher meals is a *deminimus* burden; and (2) Plaintiff has failed to plead that Defendants Jacobsen, McDaniel, and Demma were personally involved in the Fast of Tammuz incident. Defs.' Mem. of Law at pp. 7–8 & 12–15. Defendants make no argument that Defendant Weber was not personally involved in this incident.

Plaintiff asserted that the Fast of Tammuz "is recognized by DOCCS religious calender as a mandatory holy[]day for all Jews in DOCCS custody and control," and that he observed the fast

"as mandated under Jewish Law and DOCCS religious calender."[18] *Id.* at ¶¶ 35 & 36. Clearly, Plaintiff believed the Fast of Tammuz was a Jewish – and therefore religious – holiday. *Id.* The fact that he observed the day-long fast despite having not been provided with any food prior to beginning his fast is sufficient, at this early stage, to plausibly establish that his belief was also sincerely held. Thus, Plaintiff has sufficiently stated a free exercise claim. *Ochoa v. Connell*, 2007 WL 3049889, at *6. Likewise, the fact that Plaintiff sincerely believed that observance of the Fast of Tammuz was mandatory under "Jewish law" leads us to believe that its observance was "central" to his practice of Judaism. *See Ford v. McGinnis*, 352 F.3d at 593-94. Therefore, by failing to provide Plaintiff with food before or after the Fast of Tammuz, his ability to freely exercise his religion was "substantially burdened" for purposes of RLUIPA. *See id*. at 593 ("Whether a particular practice is religiously mandated is surely relevant to resolving whether a particular burden is substantial.") (citing *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. at 717–18).

With regard to Defendants' second argument, we note that Plaintiff has alleged that Defendants McDaniel, Demma, and Weber were ordered by Defendant Jacobsen to feed Plaintiff on July 19, both before and after the Fast of Tammuz, and that despite this order he was not served any food at all on July 19. Compl. at ¶ 36. However, neither this allegation, nor any of the other facts pled by Plaintiff are sufficient facts from which it can be plausibly inferred that Defendant Jacobsen was personally involved in this incident. It strains credulity, and is therefore implausible, to suggest that a supervisor somehow encouraged, condoned, or participated in violating her own

---

[18] We note in this regard that it is irrelevant whether these beliefs are accurate, what matters is whether they were sincerely held by Plaintiff. *See Ford v. McGinnis*, 352 F.3d 582, 590– 91 (2d Cir. 2003) (noting that it is not within the judicial ken to answer "ecclesiastical question[s]," such as whether a particular belief, once determined to be sincerely held and religious from the perspective of the prisoner is also valid from an ecclesiastical perspective).

direct order based solely on the allegation that the order ultimately wasn't followed.  Nor does Defendant Jacobsen's September 9 letter in which she discusses the July 19 incident constitute personal involvement.  *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (prison supervisors cannot be deemed personally involved based simply on a response to a complaint).

Accepting as true Plaintiff's allegation that Defendants Weber, McDaniel, and Demma were ordered to ensure that Plaintiff was fed, and that nonetheless he was not, we find it is plausible to infer that these Defendants were personally involved in the Fast of Tammuz incident.

For these reasons, we recommend that Defendants' Motion to Dismiss Plaintiff's First Amendment and RLUIPA claims arising out of the events of July 19 be **DENIED** as to Defendants McDaniel, Demma, and Weber and **GRANTED** as to Defendant Jacobsen.

### b.  Events at GCF

Plaintiff alleges that Defendants Doldo, Pirie, and Crawford removed the microwave from his housing unit and prevented him from using the Sukkah Booth during the Festival of Sukkot, thus rendering him unable to pray over or eat his holy meals in violation of the First Amendment and RLUIPA.[19]  Compl. at ¶ 125.  Defendants move to dismiss Doldo and Pirie from this claim solely on the ground that Plaintiff has not established that these Defendants were personally involved in the Festival of Sukkot incident.  Defs.' Mem. of Law at pp. 12–15.  Defendants did not argue that Defendant Crawford was not personally involved.

Although Defendants failed to contest the issue, it is clear that Plaintiff's claims are sufficient

---

[19] Plaintiff also alleges that on October 14, two days after the start of the Festival of Sukkot, he sent copies of a grievance alleging "religious discrimination, retaliation, unequal protection, and Jew Hating actions by GFC" to Defendants Jacobsen, Fischer, and Pirie.  Compl. at ¶ 78.  Unlike Defendant Fischer who never personally answered the Plaintiff's letter, Defendant Jacobsen did respond to Plaintiff.  *See* Compl., Exs. W & Z.  However, merely responding to an inmate's letter, without more, is insufficient to establish personal involvement on behalf of a supervisor.  *See Sealey v. Giltner*, 116 F.3d at 51.

to establish the threshold issues under a free exercise and RLUIPA analysis. Plaintiff has stated that he received an invitation from the facility's Rabbi to participate in the Jewish holy festival of Sukkot, which alone is sufficient to establish that participation therein was religious in the scheme of Plaintiff's beliefs. Furthermore, Plaintiff has stated that it was his belief that during the week long Festival of Sukkot, he was required to pray over and then eat his meals in the Sukkah Booth.[20] *See* Compl. at ¶¶ 59, 70(A), 72, 73, & 86. The fact that Plaintiff did not eat any of the meals which he was unable to pray over, amounting to a non-consecutive 104-hour fast, is sufficient at this stage to plausibly support the inference that his beliefs about the Festival and the prayer requirements were sincere. Thus Plaintiff has sufficiently stated a free exercise claim. *See Ochoa v. Connell*, 2007 WL 3049889, at *6. Moreover, the fact that Plaintiff was forced to forgo these "required" activities twelve times over the course of a single week is more than sufficient to plausibly infer that these infringements "substantially burdened" Plaintiff's ability to practice his religion for purposes of RLUIPA. *See Ford v. McGinnis*, 352 F.3d at 593

With regard to Defendants Doldo and Pirie, Defendants claim that Plaintiff's only basis for implicating Defendant Doldo is the fact that he signed off on a memorandum approving the Festival of Sukkot and then subsequently failed to ensure that the event went according to the plans laid out in that memorandum. Defs.' Mem. of Law at pp. 12–15; Compl. at ¶ 75. They further claim that Plaintiff's only allegations against Defendant Pirie were that he signed the same memorandum and responded by letter to some of Plaintiff's complaints. Defs.' Mem. of Law at p. 14; Compl. at ¶¶ 76 & 84 & Exs. N & O. However, this is not entirely accurate. Plaintiff also alleged in his Complaint that Defendants Doldo and Pirie intentionally prevented Plaintiff from accessing the

---

[20] Here again, it is irrelevant that this belief may or may not be true, only that it is sincerely held. *See supra* note 17.

Sukkah Booth on October 15, 16, & 19, causing him to miss several meals, Compl. at ¶¶ 80, 81, 85, & 92, and arranged for the microwave to be taken out of Plaintiff's housing unit in order to prevent him from being able to heat up his religious meals, *id.* at ¶¶ 95 & 98. As the heart of Plaintiff's First Amendment and RLUIPA claim revolves around his inability to properly observe the Festival of Sukkot due to his inability to access the Sukkah Booth and pray over or eat his holy meals, these additional allegations are sufficient, at this early stage, to personally implicate Defendants Doldo and Pirie.

Therefore we recommend that Defendants' Motion to Dismiss Plaintiff's Festival of Sukkot free exercise and RLUIPA claims be **GRANTED** as to Defendant Jacobsen[21] and **DENIED** as to Defendants Crawford, Doldo, and Pirie.

### 7. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires that "state actors [] treat similarly situated people alike." *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir. 1995). To prove an equal protection violation, claimants must prove that they were purposefully discriminated against or intentionally treated differently than others similarly situated. *Id.* Furthermore, claimants "also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (internal quotation marks and citations omitted).

In the instant case Plaintiff's allegations that: (1) Defendants Ellis and Weber prevented Jewish services from being held on July 11 but allowed Christian and Wicca services on the same

---

[21] *See supra* note 19.

day "because they prefer one religion over the other," Compl. at ¶ 19; and (2) in an effort to "establish one religion [] without Jews," Defendants Doldo, Crawford, and Pirie failed to open up the Activities Building to allow Jewish inmates access to the Sukkah Booth on October 14, 15, and 16, but allowed Muslims, Catholics, and Protestants to hold services in the Activities Building on those same days, *id.* at ¶¶ 77, 80, & 81, are both sufficient to state a claim for denial of equal protection. Here Jewish, Muslim, Catholic and Protestant inmates are similarly situated in that they are all religious groups seeking to utilize prison facilities to hold religious services, and Plaintiff alleges that the Defendants facilitated the use of prison facilities for all of the other religious groups except the Jewish inmates for purely discriminatory reasons.

Plaintiff has also states that Defendant Jacobsen was personally involved in these acts. Compl. at ¶ 126. However, Plaintiff's allegation is conclusory as he has failed to plead any set of facts from which Defendant Jacobsen's personal involvement can be inferred.

Therefore, we recommend Defendants' Motion to Dismiss as to these claims be **GRANTED** as to Defendant Jacobsen and **DENIED** as to Defendants Weber, Ellis, Doldo, Pirie, and Crawford.

On the other hand, Plaintiff's allegations that Defendants (1) allowed Muslim inmates to have Inmate Facilitators but not Jewish inmates, Compl. at ¶ 107; and (2) refused to allow Jewish Rabbis to bring *sealed* kosher food into the prison but allowed Muslims to bring *unsealed* food into the prison, *id.* at ¶105, are both insufficient to state a claim for denial of equal protection.

To begin with, Plaintiff has failed to allege that Jewish inmate facilitators are not permitted for discriminatory reasons. Thus, we recommend that this claim be **DISMISSED**. However, in light of Plaintiff's *pro se* status, we further recommend that he be given **LEAVE TO AMEND** this claim.

Furthermore, Plaintiff's Kosher food claim also fails. To begin with, Plaintiff failed to identify who sent the email to the Rabbis barring them from bringing in *sealed* foods, thus there is no personally responsible party. Moreover, even if a party had been identified, and/or to the extent Plaintiff seeks to challenge the prison's policy directly, such a claim would necessarily fail. Simply stated, the parties are not similarly situated, nor are they being treated differently. Here Plaintiff complains that one group is being prevented from bringing in *sealed* food containers, and the other *unsealed* food containers. The fact that a prison may apply a different policy regarding *sealed* containers (which cannot be readily searched) versus *unsealed* containers (which can be readily inspected before entering the facility) does not provide the basis for an equal protection claim. Therefore we recommend that Defendants' Motion to Dismiss be **GRANTED** as to this claim.

### 8. Qualified Immunity

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Firzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng v. Coughlin*, 858 F.2d at 895.

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). The only pleading filed in the present case thus far is the Complaint. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather in their memorandum of law in support of their Motion to Dismiss. Generally, however,

*-32-*

"the defense of qualified immunity cannot support the grant of a . . . 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983); *see also McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (quoting *Green*). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall*, 22 F. Supp. 2d 156, 162 (S.D.N.Y. 1998) (citing *Green v. Maraio*, 722 F.2d at 1019); *see also McKenna v. Wright*, 386 F.3d at 435.

The Second Circuit has further held that qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004).

Defendants argue that Plaintiff has failed to state any constitutional violations, and that they are therefore entitled to qualified immunity. Of course, if we were unable to find sufficient allegations of any constitutional violations qualified immunity would be unnecessary, as Defendants would not actually face any liability. However, here we have found sufficient allegations to substantiate Plaintiff's claims that some constitutional violations may have occurred. Moreover, these claims require a fact specific analysis that cannot be completed without first engaging in further discovery. Until a more fully developed record has been compiled, adjudging the reasonableness of any of the Defendants' actions in this case would simply be premature.

## III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 30) be **GRANTED IN PART AND DENIED IN PART**, in accordance with this order, as summarized below:

1.  **GRANTED** as to all claims against Defendants Fischer and Jacobsen and they should be **DISMISSED** from this action for lack of personal involvment;

2.  **GRANTED** as to all monetary claims against all Defendants in their official capacities;

3.  **GRANTED, WITH LEAVE TO AMEND**, as to Plaintiff's retaliation claim against Defendants Crawford, Doldo, and Pirie regarding the incidences which occurred during the Festival of Sukkot;

4.  **GRANTED** as to Plaintiff's July 11 RLUIPA claim at MSCF against Defendants Weber, Ellis, and McDaniel;

5.  **GRANTED** regarding Plaintiff's free exercise and RLUIPA claims regarding the events of July 19 at MSCF as to Defendant Ellis;

6.  **DENIED** as to Plaintiff's retaliation claims against Defendants Ellis, Demma, Weber, and McDaniel, regarding the July 11 and July 19 incidences at MSCF;

7.  **DENIED** as to Plaintiff's July 11 free exercise claim at MSCF against Defendants Weber, Ellis, and McDaniel;

8.  **DENIED** regarding Plaintiff's free exercise and RLUIPA claims regarding the events of July 19 at MSCF as to Defendants McDaniel, Demma, and Weber;

9.  **DENIED** as to Plaintiff's free exercise and RLUIPA claims regarding the events which occurred at the Festival of Sukkot as against Defendants Crawford, Doldo, and Pirie;

10.  **DENIED** as to Plaintiff's Fourteenth Amendment Equal Protection claims against Defendants Weber, Ellis, Doldo, Pirie, and Crawford;

11.  **DENIED** as to Plaintiff's First Amendment free flow of mail and retaliation against Defendant Kupiec;

12.  Plaintiff's Fourteenth Amendment equal protection claim arising out of the prison's

policy prohibiting sealed food containers from entering the facility be **DISMISSED**;

13.    Plaintiff's Fourteenth Amendment equal protection claim related to the lack of Inmate Facilitator's for Jewish inmates be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   March 7, 2013
        Albany, New York

Randolph F. Treece
U.S. Magistrate Judge