**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

PATRICK GUILLORY,

                        Plaintiff,

        - v -                                    Civ. No. 9:12-CV-280
                                                            (LEK/RFT)

ROBERT WEBER, *Cleric, Mid-State Correctional Facility;*
KURT ELLIS, *Cleric, Mid-State Correctional Facility;*
KAREN MCDANIEL, *Acting Superintendent of Programs,*
*Mid-State Correctional Facility;* NICK DEMMA,
*Acting Food Services Administrator, Mid-State Correctional*
*Facility;* THEDA KUPIEC, *Senior Mailroom Supervisor,*
*Mid-State Correctional Facility;* NUNZIO DOLDO,
*Acting Superintendent, Gouverneur Correctional Facility;*
ROBERT PIRIE, *Deputy Superintendent of Programs,*
*Gouverneur Correctional Facility;* DANIEL CRAWFORD,
*Deputy Superintendent of Security, Gouverneur Correctional*
*Facility,*

                        Defendants.

**APPEARANCES:**                              **OF COUNSEL:**

PATRICK GUILLORY
*Pro se* Plaintiff
09-B-0714
Clinton Correctional Facility
P.O. Box 2002
Dannemora, NY 12929

HON. ERIC T. SCHNEIDERMAN              ADRIENNE J. KERWIN, ESQ.
Attorney for Defendants                        Assistant Attorney General
Attorney General of the State of New York
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## <u>REPORT-RECOMMENDATION and ORDER</u>

On February 12, 2011,[1] *pro se* Plaintiff Patrick Guillory, while incarcerated at

Gouverneur Correctional Facility, commenced a civil rights action, pursuant to the

Religious Land Use Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc

*et seq.*, and 42 U.S.C. § 1983 for alleged violations of his rights under the First and

Fourteenth Amendment stemming from his confinement at both Gouverneur and Mid-

State Correctional Facilities.  *See generally* Dkt. No. 1, Compl.  On August 18, 2014,

Defendants moved for summary judgment.  Dkt. No. 140.  On September 5, 2014,

Plaintiff filed his Response in opposition.  Dkt. No. 147.[2]  The following claims are

presently before the Court:[3]

> 1. Retaliation claims against Mid-State Defendants Ellis, Demma, Weber, and
> McDaniel for the July 11th and July 19th incidents;

---

[1] The Second Circuit has held that due to the unique difficulties faced by incarcerated *pro se* litigants, a prisoner's pleading is deemed to be properly filed at the time he or she hands the papers to the prison authorities for transmittal to the court.  *Dory v. Ryan*, 999 F.2d 679, 681-82 (2d Cir. 1993), *modified on reh'g*, 25 F.3d 81 (2d Cir. 1994).  It is presumed that a prisoner handed the pleading to the prison guard on the date he signed the complaint.  *Shaw v. Superintendent Attica Corr. Fac.*, 2007 WL 951459, at *3 n.3 (N.D.N.Y. Mar. 28, 2007).

[2] Defendants did not file a reply.

[3] The following claims were dismissed from this action: 1) all claims against Defendants Fisher and Jacobsen for lack of personal involvement; 2) Plaintiff's monetary claims against all of the Defendants in their official capacities; 3) Plaintiff's July 11th RLUIPA claim against Mid-State Defendants Weber, Ellis, and McDaniel; 4) Plaintiff's July 19th free exercise and RLUIPA claims against Mid-State Defendant Ellis; 5) Plaintiff's retaliation claim against Defendants Crawford, Doldo, and Pirie; and 6) Plaintiff's Fourteenth Amendment Equal Protection claim relating to a policy that prohibits sealed food containers from entering the facility and to the lack of an Inmate Facilitator for Jewish inmates. Dkt. No. 50, Order, dated Mar. 28, 2013 *adopting in its entirety*, Dkt. No. 46, Rep.-Rec. & Order, dated Mar. 7, 2013.

2. First Amendment free exercise claim against Mid-State Defendants Weber, Ellis, and McDaniel for the lack of Jewish service on July 11th;

3. First Amendment free exercise and RLUIPA claims against Mid-State Defendants McDaniel, Demma, and Weber for failing to provide him with a meal to break his fast on July 19th;

4. First Amendment free exercise and RLUIPA claims against Gouverneur Defendants Crawford, Doldo, and Pirie for the events that occurred during the Festival of Sukkot;

5. Fourteenth Amendment equal protection claim against Gouverneur Defendants Doldo, Pirie, and Crawford as well as Mid-State Defendants Ellis and Weber; and

6. Plaintiff's First Amendment and retaliation claims against Mid-State Defendant Kupiec.

# I. DISCUSSION

## A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil

Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora*

*Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are undisputed.

## B. Facts

### 1. Mid-State Correctional Facility

#### a. July 11, 2011

Plaintiff claims that he and other Jewish inmates were prevented from attending

Jewish services on July 11, 2011, while Christian and Wicca inmates were permitted to attend their respective religious services on that date. Compl. at ¶ 19. Facility chaplains are responsible for planning and scheduling religious events and services, but only for the particular religion that he or she practices. Dkt. No. 140-4, Kurt Ellis Decl., dated May 15, 2014, at ¶ 7. They are also responsible for documenting an inmate's request to attend such services, which includes arranging "call-outs." *Id.* at ¶¶ 7-8. A call-out is an authorization slip that permits inmates to attend religious functions. *Id.* at ¶ 9. Once a call-out is submitted by a facility chaplain, it must be approved by the Deputy Superintendent of Programs. *Id.* at ¶ 10.

Defendant Karen McDaniel is employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as Mid-State's Acting Deputy Superintendent for Programs. Dkt. No. 140-6, Karen McDaniel Decl., dated May 15, 2014, at ¶ 1. On July 12, 2011, McDaniel received a letter from Plaintiff complaining that a call-out was not issued for Jewish service on July 11th. *Id.* at ¶ 10.

Defendant Kurt Ellis is the Protestant Chaplain at Mid-State, and, according to facility policy, is not responsible for arranging religious services for any other faith-based groups. Ellis Decl. at ¶¶ 1& 7. Rabbi Theodore Max is Mid-State's Chaplain for the Jewish faith.[4] *Id.* at ¶ 11. On July 11, 2011, Ellis informed Rabbi Max that,

_____

[4] Rabbi Max is not a defendant in this action.

due to a clerical error in the call-out office, a call-out for Jewish service had been left off the call-out list and that Plaintiff was upset that Jewish service was not held. *Id.* at ¶ 19. On Ellis's suggestion, Rabbi Max provided Plaintiff with a private Jewish service on July 11, 2011. *Id.* at ¶¶ 21-22.

During all relevant times, Defendant Robert Weber was employed by DOCCS as Mid-State's Coordinating Chaplain. Dkt. No. 140-9, Robert Weber Decl., dated May 15, 2014, at ¶ 1. Weber states that Rabbi Max, in his capacity as the Jewish Chaplain, was responsible for preparing the call-out for Jewish service on July 11, 2011, but his records indicate that a call-out for Jewish service was not published on that date. *Id.* at ¶¶ 10-11.

### b. July 19, 2011

On July 14, 2011, Defendants Weber and McDaniel received a memorandum from Catherine M. Jacobsen, DOCCS Acting Deputy Commissioner of Program Services, which outlined the protocol for the Jewish Fast of Tammuz. Weber Decl. at ¶ 13; McDaniel at ¶ 13. The memorandum states that "[a]ny Jewish inmate who chooses to participate in the fast will be excused from the Cold Alternative Diet[5] for all three meals" and "alternative procedures to distribute the evening meal should be

---

[5] Inmates that refrain from eating food items served to the general inmate population due to religious beliefs are eligible for the Cold Alternative Diet ("CAD"). Dkt. No. 140-2, Nick Demma Decl., dated May 23, 2014, at ¶ 6. Participation in the CAD is mandatory. If an inmate has more than thee unexcused absences from CAD meals in one week, that inmate is suspended from participating in CAD. *Id.* at ¶ 7.

implemented by the facility" because Jewish inmates "can not eat until after the sun has set" during the Fast of Tammuz. Dkt. No. 147-1, Pl.'s Resp. Ex., at p. 3, Jacobsen Mem., dated July 14, 2011.[6] Weber forwarded the memorandum to Rabbi Max and directed him to make the necessary meal accommodations for any Jewish inmate wishing to participate. Weber Decl. at ¶ 13. On July 19, 2011, Plaintiff did not receive a meal to break his fast. McDaniel at ¶ 20. On July 20, 2011, Defendant Weber "learned that [Plaintiff] did not receive a meal to break the Fast of Tammuz." *Id.* at ¶ 14.

Facility chaplains are also responsible for submitting event packets and the list of inmates wishing to participate in a particular fast or religious event that requires special dietary consideration. McDaniel Decl. at ¶ 16. Pursuant to DOCCS rules, event packets are to be submitted to McDaniel's office at least thirty days in advance of such events. *Id.* On July 19, 2011, McDaniel first became aware of Plaintiff's complaint that he was not provided with a meal to break his fast. *Id.* at ¶ 18. McDaniel was previously unaware that Jewish inmates were planning to participate in the Fast of Tammuz because she did not receive an event packet or a list of inmates wishing to participate in the fast from Rabbi Max. *Id.* at ¶ 17. On July 28, 2011, in response to Plaintiff's complaint, McDaniel informed Plaintiff that although Rabbi

---

[6] Due to the volume of records contained in Dkt. No. 147-1, the Court will refer to the page numbers automatically assigned by this Court's Case Management Electronic Case Files System when citing to documents therein.

Max informed the mess hall staff of his participation in the fast, he "did not clearly direct staff to provide food for [Plaintiff] to break the fast." Dkt. No. 1-1, Compl. Ex. at p. 8, Tammuz Compl. Mem., dated July 28, 2011;[7] McDaniel Decl. at ¶ 20. McDaniel further stated that he understood that Rabbi Max apologized to Plaintiff, and that "[t]his mistake took place due to problems with communication, not anti-Semitism." Compl. Ex. at p. 8, Tammuz Compl. Mem.

Defendant Nick Demma is the Acting Head Cook at Mid-State and oversees food service operations. Dkt. No. 140-2, Nick Demma Decl., dated May 23, 2014, at ¶¶ 1 & 5. On July 19, 2011, Demma was not tasked with any meal planning, preparation, nor service relating to the Fast of Tammuz nor did he receive a request to prepare a meal for Plaintiff. *Id.* at ¶¶ 8-9. Generally, such requests are sent to Demma from the coordinating chaplain in advance of scheduled special events. *Id.* at ¶ 9. Demma maintains that he did not intentionally fail to feed Plaintiff on July 19, 2011. *Id.* at ¶¶ 11-12.

### c. August 22, 2011

On August 3, 2011, Plaintiff was transferred to Gouverneur Correctional Facility. Compl. at ¶ 52. Defendant Theda Kupiec is employed as Mid-State's Senior

---

[7] To minimize confusion, the Court will also refer to the page numbers automatically assigned by this Court's Case Management Electronic Case Files System when citing to Dkt. No. 1-1.

Mail Cerk. Dkt. No. 140-5, Theda Kupiec Decl., dated May 8, 2014, at ¶¶ 1-2.

Defendant Kupiec's responsibilities include inspecting incoming mail pursuant to

DOCCS Directives 4421 and 4422. *Id.* at ¶ 5. At Mid-State, all incoming mail that

cannot be forwarded is torn in half and discarded. *Id.* at ¶ 6. On August 22, 2011,

Kupiec tore Plaintiff's parcel of mail because Plaintiff was no longer housed at Mid-

State and the mailing appeared to be advertisements. *Id.* at ¶¶ 7-8. However, after

Kupiec tore the envelope in half, she realized that the contents of the mailing were not

advertisements but test scores. *Id.* at ¶ 9. Upon realizing her mistake, Defendant

Kupiec taped the mailing back together and forwarded it to Plaintiff along with an

apology note explaining her mistake. *Id.* at ¶ 10; Compl. Ex. at p. 13, Kupiec's

Apology, dated Aug. 22, 2011.

### 2. *Gouverneur Correctional facility*

#### a. *October 12, 2011*

Plaintiff received a memorandum from Rabbi Teresa Syder,[8] dated August 24,

2011, which stated:

> From Wednesday dinner, 10/12, through Wednesday
> dinner, 10/19, during the festival of Sukkot, <u>inmates
> participating in the festival meal plan</u> have the option of
> eating their meals in the Sukkah (booth). . . . Please enter
> the Activities Building through the main door, sign in with

---

[8] Rabbi Teresa Snyder is not a defendant in this action.

the Activities Building Officer, who will then designate where you will wait until it is your turn to use the sukkah. Only one inmate at a time will use the sukkah to eat all or part of his meal. . . . Please indicate below whether you plan to use the sukkah during the festival of Sukkot . . . . [T]his will constitute a special sub-group of those who have signed to participate in the Sukkot meals.

Compl. Ex. at p. 14, Rabbi Snyder Mem., dated Aug. 24, 2011 (emphasis in original).

On the form, Plaintiff indicated his intent to use the Sukkah booth during the Festival of Sukkot. *Id.* Inmates who signed up to participate in the Festival of Sukkot received a frozen Kosher dinner from the mess hall on October 12th and October 13th, which they should have been able to heat in the microwave, even if the inmate lost his microwave privilege. Dkt. No. 140-8, Rabbi Teresa Snyder Decl., dated May 20, 2014, at ¶¶ 9-10; Compl. Ex. at p. 23, Jewish Holy Day of Sukkot 2011 Mem., dated Oct. 5, 2011.

On October 12, 2011, the microwave, toaster, and hot pot were removed from Plaintiff's housing unit for a period of three days. Dkt. No. 140-3, Nunzio Doldo Decl., dated May 13, 2014, at ¶ 13. His housing unit lost its microwave privilege because an unidentified inmate violated that unit's policy by smoking cigarettes in the bathroom. Dkt. No. 140-1, Daniel Crawford Decl., dated May 14, 2014, at ¶ 16; Doldo Decl. at ¶¶ 13-14. Nevertheless inmates like Plaintiff, who lost their microwave privilege, were supposed to have access to a microwave to heat up their Kosher meals on October 12th and 13th. Synder Decl. at ¶ 12. However, Plaintiff

was unable to heat his Kosher meal on October 12th because the microwave was removed from his housing unit, and a microwave was not provided in the Activities Building for inmates' use. Crawford Decl. at ¶¶ 16-17; Synder Decl. at ¶ 11.

Defendant Robert E. Pirie was the Deputy Superintendent of Program Services at Gouverneur at all relevant times. Dkt. No. 140-7, Robert E. Pirie Decl., dated May 13, 2014, at ¶ 1. Pirie's responsibilities did not include overseeing inmates' access to microwave ovens in their housing units nor was he in charge of staffing the Activities Building. *Id.* at ¶¶ 8-9. On October 13, 2011, Pirie received Plaintiff's letter, dated October 12, 2011, in which he complains that he was unable to microwave his Kosher dinner the previous night. *Id.* at ¶ 10. *See id.* at ¶ 10 & 14. Pirie provided a copy of the letter to Bruyere and Captain Rockwood, and requested that they investigate the matter and apprise him of the outcome.[9] *Id.* at ¶ 11. That same day, Bruyere advised Defendant Pirie that the matter was resolved. *Id.* at ¶ 12. Based on that information, on October 13, 2011, Pirie issued a memorandum to Plaintiff advising him that no further action was deemed necessary. *Id.* at ¶ 13.

> b. *October 13, 2011 - October 16, 2011 & October 19, 2011*

Plaintiff was unable to access the Activities Building during mealtimes from October 13, 2011 to October 16, 2011, and on October 19, 2011. Dkt. No. 140-10,

---

[9] Bruyere is the Food Service Administrator. Dkt. No. 140-7, Robert E. Pirie Decl., dated May 13, 2014, at ¶ 11. Bruyere and Captain Rockwood are not defendants in this action.

Adrienne J. Kerwin Decl., Ex. A, Patrick Guillory Dep., dated Sept. 19, 2013, at p. 55. As a result, he could not reach the Sukkah booth on those days; however, he was able to access the Sukkah booth on October 12th,[10] 17th and 18th. *See id.*; Compl. at ¶¶ 67-68.

Plaintiff states that under Jewish law, he is mandated to eat his food in the Sukkah booth during the Sukkot holiday. Guillory Dep. at p. 99. According to Rabbi Synder, under Jewish law, there are circumstances where one may be excused from eating in the Sukkah booth, but under no circumstance does Jewish law require an inmate to abstain from eating due to his inability to access the Sukkah booth. Synder Decl. at ¶¶ 13-14.

Defendant Daniel Crawford is Gouverneur's Deputy Superintendent of Security. Crawford Decl. at ¶ 1. Plaintiff wrote a letter addressed to Defendants Pirie and Crawford regarding his inability to access to the Sukkah booth. Pirie Decl. at ¶ 14; Crawford Decl. at ¶ 7. In response to Plaintiff's complaint, which was received on October 17, 2011, Defendant Crawford held a meeting with the Watch Commander's Office to ensure that a correctional officer would be available at the Activities Building to accommodate those inmates who expressed interest in having their meals in the Sukkah booth during the Festival of Sukkot. Pirie Decl. at ¶ 15;

---

[10] Although Plaintiff had access to the Sukkah booth on October 12, 2011, he was unable to eat in the booth because his Kosher meal was frozen. Dkt. No. 1, Compl., at ¶ 67.

Crawford Decl. at ¶¶ 8-9. Defendant Crawford is not responsible for assigning correctional officers to their post; that is within the purview of the chart sergeants. Crawford Decl. at ¶ 11.

During all relevant times, Defendant Nunzio Doldo was the Superintendent at Gouverneur. Doldo Decl. at ¶ 3. On October 14, 2011, *via* Plaintiff's letter, Defendant Doldo first became aware of Plaintiff's complaint that he could not access the Activities Building on October 13, 2011, and that the microwave was removed from his housing unit on October 12, 2011. *Id.* at ¶ 7; Pl.'s Resp. Ex. at p. 199, Doldo Resp. to Second Set of Interrogs., dated Oct. 10, 2013. Plaintiff was unable to access the Sukkah booth on October 13th because correctional officers were not assigned to cover the Activities Building during mealtimes. Doldo Decl. at ¶ 8. The Activity Building is normally closed during mealtimes, and it was closed during mealtime on October 13th. *Id.* at ¶ 9. According to Defendant Doldo, this was unintentional and was not intended to discriminate against Plaintiff or any other Jewish inmate who was participating in the Festival of Sukkot. *Id.* Defendant Pirie states that it appears that procedural errors and miscommunication between various staff members led to the disruption of Jewish meal times during the Sukkot holiday. Pirie Decl. at ¶ 17. Pirie further states that the disruption to the Sukkot holiday was an error and not based on discrimination against Jewish inmates nor was it intended as a form of retaliation

against the Plaintiff. *Id.* at ¶¶ 18-19.

## C. First Amendment Free Exercise & RLUIPA

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. U.S. CONST. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). The free exercise clause applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). To assess a free exercise claim, "a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d 917, 926 (1988) (citations omitted).

The principles which guide the analysis of a free exercise claim are similar to those applicable to an RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006).

RLUIPA provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person –
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

RLUIPA prohibits governmental entities subject to its reach from imposing a substantial burden on religion even where it stems from a generally applicable law, practice, or policy, but it places a higher burden on the defendants than does the First Amendment, which requires only that an infringement be "reasonably related to legitimate penological interests." *Dove v. Broome Cnty. Corr. Facility*, 2011 WL 1118452, at *10 (internal citations omitted). While the statute does not define "substantial burden," the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence . . . Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717-18 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck*).

### 1. Mid-State Correctional Facility

#### a. July 11, 2011

Plaintiff claims that Mid-State Defendants McDaniel, Weber, and Ellis prevented him and other Jewish inmates from attending Jewish service on July 11, 2011, in violation of his First Amendment right to freely exercise his religion. Defendants argue that these three Defendants were not personally involved in the July 11th incident. The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d at 874 & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which

unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d at 873 (citations omitted); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

Here, Jewish service was not held on July 11, 2011 because either Rabbi Max failed to arrange a call-out for such service or there was a clerical error in the call-out office. Ellis Decl. at ¶ 19; McDaniel Decl. at ¶ 11. Therefore, McDaniel, Weber, and Ellis should be dismissed from Plaintiff's free exercise claim because they are not responsible for submitting call-outs for Jewish services or Jewish events, nor are there any facts suggesting that they prevented Rabbi Max from submitting a call-out. In any event, Plaintiff's free exercise claim fails because the failure to call-out Jewish inmates for service on July 11th was an isolated incident. *Gill v. DeFrank*, 8 F. App'x

35, 37 (2d Cir. 2001) (missing one religious service does not violate an inmate's First Amendment right to the free exercise of his religion); *Troy v. Kuhlmann*, 1999 WL 825622, at *15 (S.D.N.Y. Oct. 15, 1999). Moreover, Plaintiff, ultimately did receive religious service on July 11th as Rabbi Max provided him with a private service that evening.

### b. July 19, 2011

Plaintiff asserts that his religious rights were violated under the First Amendment and RLUIPA when Defendants Weber, McDaniel, and Demma failed to provide him with a meal on July 19, 2011, to break his fast. To be sure, Plaintiff meets the first element of this claim as he believes he is required to break his fast under Jewish law. Pl.'s Resp. in Opp'n, at p. 17. Although it does not appear that Mid-State has a policy of denying meals to those wishing to break their religious fast, "[a]n individualized decision to deny an inmate the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise." *Salahuddin v. Goord*, 467 F.3d at 274 n.4 (citations omitted). However, "[c]ourts have generally held that incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim." *Washington v. Afify*, 968 F. Supp. 2d 532, 538 (W.D.N.Y. 2013) (collecting cases). Thus, the failure to provide Plaintiff with a meal on July 19th to break his fast is

insufficient to establish a free exercise claim or a claim under RLUIPA. *Ward v. Goord*, 2009 WL 102928, at *9 (N.D.N.Y. Jan. 13, 2009); B*rown v. Graham*, 2010 WL 6428251, at *16 (N.D.N.Y. Mar. 30, 2010) (finding that the withholding of a noon meal was *de minimus* and did not violate plaintiff's rights under the First Amendment nor RLUIPA). Therefore, the Court recommends **granting** Defendants' Motion for Summary Judgment pertaining to Plaintiff's July 19th free exercise and RLUIPA claims.

### 2. Gouverneur Correctional Facility

#### a. October 12, 2011

Plaintiff alleges that he did not have access to a microwave in order to heat his Kosher meal on October 12, 2011[11] in observance of Sukkot. However, Plaintiff fails to demonstrate that Crawford, Doldo, or Pirie were personally involved with this incident. The microwave was removed from Plaintiff's housing unit because it was discovered that an inmate was smoking cigarettes in the bathroom. Defendants Crawford, Doldo, and Pirie did not direct the removal of the microwave. *See* Crawford Decl. at ¶¶ 15-18; Doldo Decl. at ¶¶ 7 & 14; Pirie Decl. at ¶¶ 9-11. Instead, the record reflects that Pirie, Doldo, and Crawford only learned about Plaintiff's inability to heat his Kosher meal after October 12th. Therefore, the Court

---

[11] Although it appears that Plaintiff may have been unable to heat his dinner on October 12th and 13th, Plaintiff is solely seeking redress for the October 12th incident. *See generally* Compl. at ¶¶ 66-72.

recommends **dismissing** Pirie, Doldo, and Crawford from Plaintiff's October 12th free exercise and RLUIPA claims for lack of personal involvement.

   b. *October 13, 2011 to October 16, 2011 & October 19,* 2011

Plaintiff additionally contends that Defendants Crawford, Doldo, and Pirie violated RLUIPA and the Free Exercise Clause when they prevented his ability to access the Sukkah booth from October 13th through the 16th, and on the 19th. However, Defendants Crawford, Doldo, and Pirie were also not personally involved with Plaintiff's inability to reach the Sukkah booth. The record demonstrates that Crawford and Pirie first learned of Plaintiff's complaint regarding closure of the Activities Building on October 17th and resolved the matter on that date. As a result, the Court cannot impose supervisory liability for closures that occurred prior to the 17th. The Court also cannot impose supervisory liability for the October 19th closure because Crawford and Pirie remedied the issue on the 17th and were entitled to assume that their subordinates would follow their directives to keep the Activities Building open during mealtimes until the end of the Sukkot holiday. *Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 340 (E.D.N.Y. 2013) (noting that the state defendants "were entitled to expect that their subordinates would implement their directions"). Thus, the Court recommends **dismissing** Crawford and Pirie from Plaintiff's free exercise and RLUIPA claims with respect to his inability to access the Sukkah booth.

The Court also finds that Superintendent Doldo was not personally involved with Plaintiff's inability to access the Sukkah booth. It is now well-settled in this Circuit that a defendant's supervisory status or his failure to respond to an inmate's letter of complaint is insufficient to render such defendant liable under § 1983. *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 650-51 (W.D.N.Y. 2010) (collecting cases). "The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation." *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008). However, there are circumstances when a supervisory official "cannot insulate" himself from supervisory liability by failing to respond to a letter of complaint. *Id.* (quoting *McKenna v. Wright*, 386 F. 2d 432, 437-38 (2d Cir. 2004), and discussing personal involvement when a supervisor is confronted with claims of an "ongoing" constitutional violation). Whether a supervisory official can be liable under the second *Colon* factor[12] — failing to remedy a wrong after learning of the violation — appears to turn on whether the complaint

--------

[12] The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of NewHaven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 F. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

alleges an "ongoing" constitutional violation. *Id.* A supervisor will be "personally involved" if the complaint alleges an "ongoing" constitutional violation, the supervisor reviews the complaint, and it is a situation that he can remedy directly. *Id.* (quoting *Hall v. Leclaire*, 2007 WL 1470532 (S.D.N.Y. May 22, 2007)). On the other hand, if the violation has already occurred and is not ongoing, then "the official will not be found personally responsible for failing to remedy a violation." *Id.*

Here, Superintendent Doldo was unaware of an ongoing constitutional violation. Instead, it is uncontested that on October 14, 2011, Superintendent Doldo learned about the October 12th microwave incident and Plaintiff's inability to enter the Activities Building the previous day.[13] There are no other facts suggesting that Doldo was aware of an ongoing issue with access to the Activities Building during mealtimes. And in fact, Plaintiff was able to enter the Activities Building on October 12th. Therefore, his failure to respond to or act on Plaintiff's letter of complaint, which, at the time, appeared to refer to a previous and isolated error, is insufficient to find him personally involved in the mishaps that took place during the Festival of Sukkot. For this reason, the Court recommends **dismissing** Superintendent Doldo from Plaintiff's free exercise and RLUIPA claims.

---

[13] Defendant Doldo does not state whether he replied to Plaintiff's letter nor provides an account of his subsequent actions with regards to the letter. As a result, the Court will infer that Doldo, the moving-party, failed to reply to Plaintiff's letter of complaint. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).

## D.  First Amendment Free Flow of Non-Legal Mail

It is clear that a prisoner's First Amendment rights are implicated when the "free flow of incoming and outgoing mail" is hindered.  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).  However, the right to the free flow of mail does not provide for the unfettered free flow of mail.  Reasonable restrictions to the free flow of mail are allowed, provided the restrictions "further[] one or more of the substantial governmental interests of security, order, and rehabilitation . . . and must be no greater than is necessary or essential to the protection of the particular governmental interest involved."  *Id*. (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).  "To establish a claim for interference with regular, non-legal mail in violation of the First Amendment, an inmate 'must show a pattern and practice of interference that is not justified by any legitimate penological concern.'"  *Singleton v. Williams*, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (citation omitted). The Second Circuit has stated that an "isolated incident of mail tampering is usually insufficient to establish a constitutional violation."  *Id.* (quoting *Davis v. Goord*, 320 F.3d at 351).

Here, Plaintiff fails to demonstrate a pattern and practice of interference with his incoming, non-legal mail.  Although Plaintiff alleges that Defendant Kupiec destroyed an envelope sent from the Postmaster on July 29, 2011, Kupiec states that "this claim is false."  Kupiec Decl. at ¶ 12.  Nonetheless, even assuming that July 29th

and August 22nd were instances of mail interference, it is insufficient to show a pattern and practice of interference with Plaintiff's mail. *Cancel v. Goord*, 2001 WL 303713, at *6-7 (finding that neither one instance of interference with incoming, non-legal mail nor two instances of mail interference with incoming, legal mail amount to a pattern and practice of mail interference). As a result, the Court recommends **dismissing** Plaintiff's claim of interference with his incoming, non-legal mail.

## E. Retaliation

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381-83 (2d Cir. 2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d 489, 491 (2d

Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d at 492); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977) & *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994)).

### 1. July 29, 2011

Plaintiff alleges that on July 29, 2011, Kupiec read his correspondence and destroyed the original envelope in retaliation for submitting a grievance which related to the lack of religious service on July 11, 2011. Compl. at ¶¶ 42-43. There is no dispute that a grievance is protected speech and that intentionally interfering with a inmate's mail is an adverse action. However, there is no evidence that Kupiec tampered with Plaintiff's mail and, even assuming that Kupiec interfered with Plaintiff's mail on July 29th, there is no basis to infer that Kupiec retaliated against Plaintiff for submitting a grievance that did not name Kupiec. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases for the proposition that a plaintiff fails to demonstrate a causal connection when a defendant is not personally named in a grievance or a complaint). Thus, the Court recommends **dismissing** this claim.

## 2. August 22, 2011

Plaintiff also alleges that on August 22, 2011, Defendant Kupiec tore an envelope containing test scores in retaliation for filing a federal action on May 31, 2011, in which Plaintiff names Kupiec as a defendant. To be sure, Plaintiff's May 2011 federal action constitutes protected speech. And, while it is true that Kupiec ripped Plaintiff's test scores, Kupiec, upon realizing her mistake, reassembled the contents of that mailing and forwarded it to the Plaintiff along with an apology note. Such conduct cannot be characterized as an adverse action. As noted above, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d at 353 (citing *Dawes v. Walker*, 239 F.3d at 493). Thus, the Court recommends **dismissing** Kupiec from this action.

## 3. July 11, 2011

The Court also recommends **dismissing** Plaintiff's retaliation claim against Protestant Chaplain Ellis.[14] Plaintiff meets his initial burden as he sufficiently demonstrates that Ellis failed to submit a call-out slip, which prevented Plaintiff from attending Jewish service on July 11th, and, notably, this adverse action took place just forty-one days after Plaintiff filed a federal action in which Ellis was named as a

---

[14] On March 7, 2013, the undersigned, in liberally construing the Complaint, found that Plaintiff stated a retaliation cause of action against Chaplain Ellis. Rep.-Rec. & Order at p. 19.

defendant. Nonetheless, Plaintiff's retaliation claim fails as the record amply shows that Chaplain Ellis was not in charge of submitting call-outs for Jewish inmates or responsible for scheduling Jewish events or services. Thus, it is abundantly clear that Chaplain Ellis "would have taken exactly the same action absent the improper motive." *Scott v. Coughlin*, 344 F.3d at 288.

### 4. July 19, 2011

Plaintiff also alleges that Defendants Demma, Weber, and McDaniel failed to provide him with a meal to break his fast on July 19th in retaliation for filing a grievance on July 12th in which he complains about the July 11th incident. Compl. at ¶¶ 33-36. The record demonstrates, however, that McDaniel was not responsible for ensuring that Jewish inmates be provided with a meal to break their fasts, nor did Demma receive any request or special instructions to prepare a meal for the Plaintiff to break his fast. As a result, the Court finds McDaniel and Demma would have taken the same actions absent a retaliatory motive. With respect to Weber, Plaintiff fails to demonstrate that Weber took any adverse action against him. Instead, the record demonstrates that he instructed Rabbi Max to make the necessary meal accommmodation in accordance with the July 14, 2011 memorandum. For these reasons, the Court recommends **dismissing** Plaintiff's retaliation claim against Defendants McDaniel, Demma, and Weber.

**F. Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment states that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause mandates state actors to treat similarly situated people alike. *See Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (cited in *Verdal v. Frantz*, 2002 WL 31309175, at *3 n.5 (N.D.N.Y. July 31, 2002)). To state an equal protection claim, a claimant "must prove purposeful discrimination . . . directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (quoted in *Verdal v. Frantz*). To do so, it is imperative that a plaintiff demonstrate that similarly situated persons have been treated differently. *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir. 1994) (citing to *Cleburne v. Cleburne Living Ctr.*). Furthermore, religion, like race or alienage, is an inherently suspect classification. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (cited in *Leocata ex rel. Gilbride v. Wilson Coker*, 343 F. Supp. 2d 144, 150 (D. Conn. 2004)); *see also Am. Atheists, Inc. v. Port Auth. of NY & NJ*, 936 F. Supp. 2d 321, 338 (S.D.N.Y. 2013) *aff'd*, 760 F.3d 227 (2d Cir. 2014) ("If claimants can demonstrate such intentional discrimination on the basis of religion, the government action is subject to strict judicial scrutiny.") (citation and internal quotation marks omitted).

Here, Plaintiff fails to demonstrate that Jewish inmates were treated differently

from other similarly situated individuals. The record demonstrates that Jewish inmates did not have service on July 11th because a call-out was not submitted pursuant to a policy that applies to all faith-based groups in the facility. Because Plaintiff has not demonstrated that other religious groups were permitted to have religious service without submitting a call-out slip, Plaintiff cannot show that Jewish inmates were treated any differently from other groups. Likewise, Plaintiff fails to show that non-Jewish inmates were permitted to have access to the Activities Building during mealtimes while Jewish inmates were excluded from such access. Therefore, the Court recommends **dismissing** Plaintiff's Fourteen Amendment Equal Protection claim.

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 140) be **GRANTED** in its entirety and that the case be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed

with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date: March 6, 2015
     Albany, New York

_____
Randolph F. Treece
U.S. Magistrate Judge